**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DARNELL DIXON,                    )
                                  )
                Petitioner,       )        Civil Action No. 2:18-cv-1367
                                  )
        v.                        )
                                  )        Magistrate Judge Patricia L. Dodge
LAWRENCE P. MAHALLY, et al.,      )
                                  )
                Respondents.      )

## MEMORANDUM

Pending before the Court[1] is the Petition for a Writ of Habeas Corpus (ECF 1) filed by state

prisoner Darnell Dixon ("Petitioner") under 28 U.S.C. § 2254. For the reasons set forth below, the

Court will deny the Petition and will deny a certificate of appealability as to each claim.

**I.      Relevant Background[2]**

In this habeas case, Petitioner challenges the judgment of sentence imposed upon him by

the Court of Common Pleas of Allegheny County at criminal docket number CP-02-CR-17215-

2008 for the November 8, 2008 second-degree murder of Michael Ross (the "victim" or "Ross")

during the robbery of his clothing store, CC&M.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including entry of a final judgment.

[2] Respondents electronically filed as exhibits to their answer (ECF 11) relevant parts of the state court record. The documents shall be cited to by their exhibit and Bates stamp number as follows: "Resp's Ex. __ at ___." Respondents have also submitted a hard copy of the Court of Common Pleas' file for Petitioner's criminal case, including the transcripts for the pre-trial and trial proceedings (dated October 18-22, 2010 and October 25, 2010), the February 15, 2011 sentencing hearing and the June 20, 2011 hearing on Petitioner's post-sentence motion. Citations to "Trial Tr." refer to the page numbers of the October 18-22, 2010 transcript, and to "Trial Tr. II" refer to the second volume of Petitioner's trial transcript, which contains the closing arguments, closing charge, and jury verdict.

As discussed below, the Commonwealth introduced evidence at Petitioner's trial to demonstrate that he and his nephew and co-defendant, Edward Dixon ("Edward"), entered the clothing store armed with guns and demanded cash from the victim. The store was located in a high-crime area and the victim had a .38 caliber handgun nearby and defended himself with it. The victim was shot at least nine times during the robbery and died at the scene. Petitioner was also shot during the incident. (*See* Resp's Ex. 14 at 79-83.)

Petitioner and Edward ran from the scene and witnesses observed them getting into Edward's SUV, which was parked nearby. Edward then drove Petitioner to Mercy Hospital. Medical personel there reported to police that they were treating an individual who had been shot. The police interviewed Edward, who initially denied having any involvement in the crimes at the victim's store. When the police advised him that there were potential witnesses who could place him at the scene of the crime, Edward admitted that he and Petitioner entered the victim's store with masks over their faces and demanded money from the victim at gunpoint. Edward also stated that Petitioner and the victim shot at each other. Edward said that he fired shots into the floor in an attempt to scare the victim. (*Id.* at 83-87.)

At Petitioner's trial, the Commonwealth proceeded under the theory that the Petitioner and Edward were both armed during the robbery and that Petitioner shot the victim numerous times using a .22 caliber Ruger pistol that investigators subsequently recovered from a hidden panel in Edward's SUV. Edward was likely using a .32 caliber handgun during the commission of the robbery (which was not recovered). The Commonwealth introduced DNA and ballistic evidence (through its experts, Walt Lorenz and Dr. Robert Levine, respectively) to support its theory of the case. The DNA profile found on the grip of the .22 caliber pistol was consistent with Petitioner's profile. The victim and Edward were excluded as contributors. (Trial Tr. at 345.)

James McGee,[3] a homicide detective with the Pittsburgh Police Department, interviewed Petitioner at Mercy Hospital three days after the shooting, on November 11, 2008. At Petitioner's trial, Det. McGee testified that during this interview Petitioner admitted that he and Edward went to the victim's clothing store on November 8, 2008. Petitioner stated that he remembered entering the store and the victim coming out "from around the corner [with] a gun in his hand." (Trial Tr. at 242.) Petitioner further stated that "he heard a bunch of yelling, people yelling from the back room and he heard a lot of gunshots at which time he ran out of the store and ran down to go where" Edward parked his SUV. (*Id.*) Petitioner told Det. McGee that when he was running towards the SUV he started to have difficulty breathing, realized that he had been shot, and then directed Edward to drive him to the hospital. (*Id.*) Petitioner told Det. McGee that he did not know how he got shot. (*Id.* at 243.)

Petitioner initially was charged with one count each of criminal homicide, 18 Pa.C.S. § 2501(b), robbery, 18 Pa.C.S. § 3701(a)(1)(i), and conspiracy to commit robbery, 18 Pa.C.S. § 903(a)(1). Similar charges were filed against Edward. The trial court subsequently granted Petitioner's motion to sever his case from Edward's case.

On November 21, 2008, Petitioner waived a preliminary hearing. The court appointed Attorney Thomas N. Farrell ("trial counsel") to represent Petitioner. On January 15, 2009, the Commonwealth filed an Information charging Petitioner with the three counts sets forth above and also with one count of carrying a firearm without a license, 18 Pa.C.S. § 6106(a)(1).

At a pre-trial hearing held on October 18, 2010, the Commonwealth moved to add another firearm charge (possession of a firearm by person prohibited, 18 Pa.C.S. § 6105(a)(2)(i)) to the

---

[3] Det. McGee's last name is occasionally misspelled in the trial transcript and in the state court opinions. This Court uses the correct spelling of his name herein.

Information. (Trial Tr. at 5.) That request was granted and Petitioner waived his right to have that added firearm charge tried to the jury.[4] (*Id.* at 5-8.)

On October 20, 2010, the trial court held a hearing on Petitioner's motion to supress the statement he gave to Det. McGee. (*Id.* at 9.) The trial court denied that motion at the conclusion of the hearing. (*Id.* at 24-28.) It then proceeded to trial.

In its Appellate Rule 1925(a) opinion issued after Petitioner filed a direct appeal, the trial court provided the following summary of the evidence introduced at Petitioner's trial:

> On November 8, 2008, Michael Ross was the owner and operator of a business known as CC&M Fashions located on Hodgkins Street in the Northside Section of the City of Pittsburgh. Ross sold t-shirts and other sports-related wearing apparel from the store; however, because his father and grandfather who had previously operated the store were robbed or attempted to be robbed on several occasions, Ross rarely kept more than sixty dollars on the premises and he also had a thirty-eight-caliber revolver in his desk drawer. Ross opened his store sometime between 11:30 a.m. and 12:00 p.m. and shortly thereafter, Ross' father [Fred] came to the store and assisted him and was working in the back of the store, storing additional items that Ross had for sale.
>
> Earlier on November 8, 2008, Ross had attempted to call his girlfriend, Christine Johnson. They had made numerous phone calls to each other; however, they had not been able to reach each other. At approximately 1:00 p.m., Ross and Johnson were finally able to reach each other on the telephone and were talking for several moments when she heard someone come into the store. Apparently Ross believed that he had disconnected the phone connection but he had not and Johnson was able to hear what was going on in the store. Johnson heard Ross say to someone who had come into the store, "Take your hoodie off" and also heard the individual who came into the store say, "Give me your money." She then disconnected this conversation and called 911 to report a robbery that was taking place at Ross' business.
>
> Fred Ross, who was working in the back of the store, knew that his son was on the phone and decided to deal with the inventory in the storage area. While he was working in the back of the store, he heard Michael Ross yell to him, "Dad, it's on." Fred Ross then came to the front of the store and partially obscured by several racks of clothing saw two young, black males come into the store, both of whom were dressed in black and had what appeared to be black masks on. Both of the men that Fred Ross saw were armed and one of the two was yelling at Michael Ross to

---

[4] Respondents explain that such waivers are standard practice in Pennsylvania courts. It prevents the jury from hearing about a defendant's prior felony conviction. *See, e.g.*, *Commonwealth v. Jones*, 858 A.2d 1198, 1208 (Pa. Super. Ct. 2004).

"Give up the money." The two intruders were focused on Michael Ross and not Fred Ross and he was able to run out the front door and across the street to a Kuhn's Market where he had hoped to find a Pittsburgh Police Officer or security guard to assist him in the prevention of this robbery. Once he was outside of the store he heard several gunshots and turned to see the two intruders leaving the store and heading down toward Ingram Street. Fred Ross went into the store and saw Michael Ross lying on the floor and realized that there was nothing he could do for him.

Victoria Zuback, (hereinafter referred to as "Zuback"), was walking her dog along Ingram Street when she heard a series of gun shots. Shortly after hearing those gunshots, she heard the sound of footsteps approaching her and when she turned to look, she saw two individuals dressed in black, with black masks on. The first individual went to a large SUV that was parked in front of a house and [she] saw that individual go to the rear of the vehicle, open the left rear door and appear to put something in the back, close the door and then get into the driver's seat. Shortly thereafter she heard another individual heading toward the SUV and saw that individual get into the front passenger seat and then saw the vehicle leave the scene.

Jamal El-Main, (hereinafter referred to as "El-Main"), was in his bedroom on the second floor of his home [on] Ingram Street and was about to change his clothes so he could go out and rake the leaves. When he was looking out his bedroom window, he noticed a large SUV parked in front of his house, which was parked in the wrong direction. El-Main went to his son's bedroom to get a better look at the vehicle and in looking out his son's bedroom window, he saw an individual all dressed in black reach the SUV, go to the back rear, open up the rear door and attempt to dispose of something. He then saw that individual get into the driver's seat. He also saw that there was someone else in the passenger seat and although he did not have a full view of them he was able to determine that there was someone there because he saw his legs. El-Main went down the stairs but by the time he got down the stairs, the SUV was gone. When he observed the driver of the SUV, he noticed that his hair was messed up like it had been braided and combed out and processed to relax it. El-Main then went out to rake his leaves and while he was doing this chore, he was approached by homicide detectives who were investigating the shooting at CC&M and told them what he had seen. When the homicide detectives asked him whether he could identify the van and the driver if he saw them again, he told them yes.

The killing of Michael Ross occurred approximately one mile from the Allegheny General Hospital in the Northside Section of Pittsburgh at approximately 1:15 p.m. At approximately 1:30 p.m., Pittsburgh homicide detectives received a phone call from the Mercy Hospital emergency room stating that they had a shooting victim in their emergency room that was being treated. Detectives were dispatched to Mercy Hospital to investigate that shooting and determined that individual who had been shot was [Petitioner] and that he was currently in surgery for his gunshot wound. These homicide detectives also saw Edward in the emergency room. These detectives also noted a Chevrolet Yukon SUV with the driver's side and passenger side doors open and noticed that there was blood on the passenger seat area of that Yukon. They asked Edward if he was

5

the owner of the vehicle and he said that he was and they received consent from him to search that vehicle. In the rear of the vehicle, they found two black t-shirts tied up in a manner so as to permit them to be used as masks and they also found several white sports t-shirts. During the course of the inspection of the vehicle, it was noticed that the interior panel in the rear on the driver's side was loose and when that was removed a twenty-two caliber semi-automatic handgun was found.

Homicide detectives at the CC&M shooting and at Mercy Hospital were continuing to provide each other with information on what they believed to be two different shootings when it was suggested that El-Main be brought to Mercy Hospital to see if he might be able to identify the SUV and driver…

- - -

On November 11, 2008, Detective James McGee went to Mercy Hospital, seeking to interview [Petitioner]. Detective McGee was directed to [Petitioner's] attending physician and asked him whether or not [Petitioner] was in any condition to be interviewed and was informed that he could be interviewed. Detective McGee then met [Petitioner] in his hospital room and then told him the reason that he was there to interview him was about the circumstances of which he was shot on November 8, 2008. [Petitioner] told him that he had met with two detectives the day before and they advised him that he was probably going to be charged with criminal homicide. Detective McGee told him that he was probably correct and then advised him of his *Miranda* rights. [Petitioner] told Detective McGee that although he recalled going to CC&M Fashions, he did not recall where they parked the car. He remembered going into the store and then Michael Ross came from behind the counter with a gun in his hand and then he heard lots of people yelling at which time he ran out of the store back to the area where they had left the car. While running to the SUV, he had difficulty breathing and he realized he had been shot and told Edward to drive him to a hospital. After ten or fifteen minutes it became apparent that [Petitioner] was experiencing some pain and the interview ceased. [Petitioner] was discharged later that day from the hospital.

- - -

During the course of the initial investigation of the homicide scene, it was determined that three different weapons had been fired…during this robbery. Shell casings and bullets were found from a twenty-two-caliber weapon and a thirty-eight-caliber weapon. A twenty-two-caliber weapon was found in the interior quarter panel of the SUV owned by Edward and the thirty-eighty-caliber weapon was found at the Route 65 on ramp off Marshall Avenue, not far from the shooting scene. This thirty-eight caliber was lawfully owned and registered to Fred Ross, the victim's father. The thirty-two-caliber weapon was never recovered. In addition to finding the twenty-two-caliber weapon in Edward's vehicle, there were several white t-shirts that had been taken from Michael Ross' business.

(Resp's Ex. 14 at 79-86, 92; *see also id.* at 89-91 (summarizing the evidence introduced at Petitioner's trial and discussing why the jury's verdict was not against the weight of the evidence and why the Commonwealth introduced sufficient evidence to support the jury's verdict.)[5]

With respect to the criminal homicide charge, the trial court instructed the jury on first, second and third degree murder. (Trial Tr. II at 70-74.) The jury convicted Petitioner of second-degree murder, robbery, carrying a firearm without a license, and conspiracy to commit robbery.[6] (*Id.* at 85-86.) The trial court found Petitioner guilty of the severed person not to possess charge. (*Id.* at 90.) It deferred sentencing for the preparation of a pre-sentence report. (*Id.*)

Petitioner obtained new counsel (Attorney Matthew Debbis) and on February 15, 2011 the trial court sentenced him to the mandatory term of life imprisonment on the second-degree murder conviction, a consecutive 10 to 20 years for robbery, and a consecutive 10 to 20 years for conspiracy.

Petitioner, through new counsel (Attorney Scott Coffey), filed an appeal with the Superior Court of Pennsylvania in which he raised the following five claims:

1. Petitioner's robbery conviction was against the weight of the evidence;

2. The Commonwealth introduced insufficient evidence to convict him of second-degree murder since the Commonwealth failed to prove that the killing occurred during a robbery;

---

[5] The Court notes that in in its Appellate Rule 1925(a) opinion the trial court also provided background of the statements Edward gave to Detective Robert Provident. Those statements were not introduced at Petitioner's trial and Edward did not testify at Petitioner's trial. The trial court provided information regard Edward's statement in its Appellate Rule 1925(a) opinion for background and because in its opinion it was addressing the concise statement of matters complained of on appeal that Petitioner and Edward each filed in their respective direct appeal. (Resp's Ex. 14 at 76-102.)

[6] At the conclusion of Edward's trial, which was held in January 2011, a jury also convicted him of second-degree murder, robbery, possession of a firearm without a license and criminal conspiracy. (Resp's Ex. 14 at 80.)

3. The trial court erred in admitting and displaying to the jury an inflammatory and prejudicial photograph of the deceased with his eyes open;

4. The trial court erred in denying his motion to suppress the statement he gave to Det. McGee on November 11, 2008; and,

5. The trial court erred in denying the request for a voluntary manslaughter/imperfect self-defense jury instruction.

(Resp's Ex. 15 at 103-28.) Petitioner does not raise any of these stand-alone claims of trial court error in this habeas case.

The Superior Court affirmed Petitioner's judgment of sentence in *Commonwealth v. Dixon*, No. 1133 WDA 2011 (Pa. Super. Ct. Dec. 12, 2012) ("*Dixon I*"). (Resp's Ex. 17 at 161-69.) It denied each of Petitioner's claims on the merits for the reasons given by the trial court in its Appellate Rule 1925(a) opinion. (*Id.* at 161-67.) The Superior Court also *sua sponte* vacated the sentence imposed upon Petitioner for his robbery conviction because under Pennsylvania law a criminal defendant cannot be sentenced for both second-degree (felony) murder and the underlying felony, as Petitioner was in this case. (*Id.* at 168-69.)

On December 19, 2013, and after the Pennsylvania Supreme Court had denied a petition for allowance of appeal (Resp's Ex. 22 at 204), Petitioner filed a *pro se* motion for a copy of the transcripts of all prior proceedings in his criminal case. (Resp's Ex. 23 at 205.) The trial court denied the motion on December 30, 2013 because at that time Petitioner had no collateral proceeding pending under Pennsylvania's Post Conviction Relief Act ("PCRA"). (Resp's Ex. 24 at 209) (citing *Commonwealth v. Ballem*, 482 A.2d 1322 (Pa. Super. Ct. 1984)).

In March 2014, Petitioner filed in state court a *pro se* PCRA petition in which he raised more than ten grounds for relief. (Resp's Ex. 25 at 212-30.) The trial court, now the PCRA court, appointed Attorney Charles R. Pass, III to represent him. Attorney Pass subsequently filed an application for leave to withdraw and an accompanying "no-merit" letter brief pursuant to

*Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988) and *Commonwealth v. Finley*, 550 A.2d 213 (Pa. 1988) (*en banc*), in which he explained why, in his professional opinion, Petitioner stated no meritorious claim for PCRA relief. (Resp's Ex. 27 at 233-77).[7]

On June 7, 2014, the PCRA court granted Attorney Pass' request to withdraw and issued a notice advising Petitioner of its intention to dismiss his *pro se* PCRA petition pursuant to Pennsylvania Rule of Criminal Procedure 907. (Resp's Ex. 28 at 278-79.)[8] Petitioner then informed the PCRA court that he intended to proceed *pro se*. (Resp's Ex. 29 at 280-81.)

On September 21, 2014, Petitioner filed a *pro se* motion for leave to file an amended PCRA petition in order to set forth approximately seven additional grounds for relief. (Resp's Ex. 30 at 282-312.) The PCRA court appointed Attorney Alan R. Patterson as Petitioner's new PCRA counsel. (Resp's Ex. 31 at 313.) On September 16, 2015, Attorney Patterson filed a *Turner/Finley* "no-merit" letter brief and motion to withdraw in which he explained that he had analyzed

---

[7] Pennsylvania law provides that before appointed counsel can be permitted to withdraw from representing a petitioner under the PCRA, counsel is required to file and obtain approval of a "no-merit" letter or brief pursuant to the mandates of *Turner/Finley*. "The no-merit letter must set forth: 1) the nature and extent of counsel's review of the case; 2) each issue that the petitioner wishes to raise on appeal; and 3) counsel's explanation of why each of those issues is meritless." *Commonwealth v. Kelsey*, 206 A.3d 1135, 1139 (Pa. Super. Ct. 2019) (citations omitted). Counsel must file the *Turner/Finley* letter brief and send copies of it and an application to withdraw to the petitioner with the advisement that the petitioner has the right to proceed *pro se* or with a privately retained attorney. *Id.*; *see also Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 90 (3d Cir. 2013). The court must then conduct its own independent evaluation of the record to determine if it agrees with counsel that the PCRA petition is without merit. *Commonwealth v. Rykard*, 55 A.3d 1177, 1184 (Pa. Super. Ct. 2012). If the court agrees with counsel that the petition is meritless, the petitioner may proceed *pro se* or with a privately retained attorney. *Id.*

[8] At the time, Pennsylvania law required a petitioner to raise a claim of PCRA counsel's ineffectiveness in response to the PCRA court's Rule 907 notice of intent to dismiss or risk waiver. *Commonwealth v. Pitts*, 981 A.2d 875, 879-80 (Pa. 2009) (procedure abrogated by *Commonwealth v. Bradley*, 261 A.3d 381 (Pa. 2021) (holding that going forward PCRA petitioners may raise claims of PCRA counsel's ineffectiveness at first opportunity to do so, even when on PCRA appeal)).

Petitioner's September 21, 2014 *pro se* motion to amend his PCRA petition and concluded that, in his professional opinion, there were no meritorious issues. (Resp's Ex. 32 at 314-33.)

The PCRA court granted Attorney Patterson's request to withdraw and, therefore, Petitioner continued *pro se*. On December 1, 2015, the PCRA court dismissed his request for collateral relief. (Resp's Ex. 34 at 336.)

Petitioner filed a *pro se* appeal to the Superior Court. The PCRA court then issued its Appellate Rule 1925(a) opinion. (Resp's Ex. 38 at 375-98.) Thereafter, Petitioner filed his *pro se* appellate brief in which he raised approximately twenty-five issues. (Resp's ECF 39 at 406-08.)

On May 25, 2017, the Superior Court issued *Commonwealth v. Dixon*, No. 148 WDA 2016 (Pa. Super. Ct. May 25, 2017) ("*Dixon II*"), in which it held that Petitioner's claims were waived for various reasons, including because he failed to file a response to Attorney Patterson's no-merit letter. (Resp's Ex. 42 at 479-89.) Petitioner then applied for reargument in which he alleged that he did, in fact, respond to that no-merit letter but that it was not docketed in his case.[9] (Resp's Ex. 43 at 490-502.) The Superior Court granted Petitioner's motion for reargument and withdrew its decision in *Dixon II*.

On November 12, 2017, the Superior Court issued *Commonwealth v. Dixon*, No. 148 WDA 2016, 2017 WL 5946524 (Pa. Super. Ct. Nov. 12, 2017) ("*Dixon III*"). Its disposition of the claims before it that are relevant to this federal habeas case is discussed below.

After the Superior Court issued *Dixon III*, Petitioner filed a motion for reargument, which the Superior Court denied. (Resp's Ex. 47 at 557.) Petitioner did not seek discretionary review with the Supreme Court of Pennsylvania.

---

[9] Apparently, Petitioner had written and served objections on the PCRA court and the District Attorney's Office, but never filed that response with the clerk of courts.

Petitioner then filed the instant Petition for a Writ of Habeas Corpus (ECF 1) with this Court in which he raises twenty-two claims for relief.[10] In their Answer (ECF 11), Respondents assert that many of Petitioner's claims are procedurally defaulted. They also contend that none of his claims have merit. Petitioner acknowledges that many of his claims are procedurally defaulted. In his Reply (ECF 15), he addresses only Claim 9 (relating to trial counsel's failure to object to the trial court's instruction on reasonable doubt). He argues that under *Martinez v. Ryan*, 566 U.S. 1 (2012), he can overcome the default of Claim 9 and, therefore, the Court should review it *de novo*.

## II.    Discussion

### A.    Jurisdiction

The Court has jurisdiction under 28 U.S.C. § 2254, the federal habeas statute applicable to prisoners in custody pursuant to a state-court judgment. It permits a federal court to grant a state prisoner a writ of habeas corpus "on the ground that he or she is in custody in violation of the Constitution…of the United States." 28 U.S.C. § 2254(a). Errors of state law are not cognizable. *Id.*; *see, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Indeed, the Court is bound by the state courts' determinations of state law. *See*, *e.g.*, *Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir. 2004) ("Federal courts reviewing habeas claims cannot 'reexamine state court determinations on state-law questions.'") (quoting *Estelle*, 502 U.S at 67-68).

---

[10] Petitioner's claims are numbered one through twenty-three, but there is no Claim 22. (*See* ECF 1 at 48-49, where the space for "Claim 22" is left blank.) Petitioner raised many of his claims to the Superior Court in his PCRA appeal, but he numbered those claims differently in that appeal. *See Dixon III*, 2017 WL 5946524 at *9-10 (listing the twenty-five claims Petitioner raised in his PCRA appeal.) When discussing Petitioner's claims herein, this Court refers to the number Petitioner assigned to them in his federal habeas petition at ECF 1.

It is Petitioner's burden to prove that he is entitled to the writ. *See, e.g., Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 848-49 (3d Cir. 2017). There are other prerequisites that he must satisfy before he can receive habeas relief on his claims (for example, the burden imposed upon him by the standard of review enacted by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") (which is discussed below), but, ultimately, Petitioner cannot receive federal habeas relief unless he demonstrates that he is in custody in violation of his federal constitutional rights. 28 U.S.C. § 2254(a); *see, e.g., Vickers*, 858 F.3d at 849.

B.      Standard of Review

In 1996, Congress made important amendments to the federal habeas statutes with the enactment of the AEDPA. Among other things, AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."[11] *Bell v. Cone,* 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). It reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal quotations and citation omitted).

---

[11] A finding of fact made by a state court always has been afforded considerable deference in a federal habeas proceeding. *See, e.g.*, *Vickers*, 858 F.3d at 850 (even in pre-AEDPA cases, "'federal habeas courts [had] no license to redetermine credibility of witnesses who demeanor ha[d] been observed by the state trial court, but not by them'") (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (bracketed text added by the court of appeals)). AEDPA continued that deference and mandates that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). A petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

AEDPA put into place a new standard of review, which is codified at 28 U.S.C. § 2254(d). It applies "to any claim that was adjudicated on the merits" by the Superior Court[12] and, in relevant part, it prohibits a federal habeas court from granting relief unless the petitioner established that the Superior Court's "adjudication of the claim":

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]

28 U.S.C. § 2254(d)(1).[13] For the purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when the state court (here, the Superior Court) made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground. *See, e.g., Richter*, 562 U.S. at 98-100; *Robinson v. Beard*, 762 F.3d 316, 324 (3d Cir. 2014).

Importantly, although the Superior Court in *Dixon III* held that many of Petitioner's claims were waived due to briefing deficiencies, it also provided an alternative holding on the merits with respect to many of those claims. AEDPA's standard of review applies to the Superior Court's alternative adjudication on the merits. *See*, *e.g.*, *Rolan v. Coleman*, 680 F.3d 311, 320 (3d Cir.

---

[12] When applying § 2254(d), the federal habeas court considers the "last reasoned decision" of the state courts. *Simmons v. Beard*, 590 F.3d 223, 231-32 (3d Cir. 2009) (quoting *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008)); *Brown v. Sup't Greene SCI*, 834 F.3d 506, 512 (3d Cir. 2016).

[13] Section 2254(d)(1) applies to questions of law and mixed questions of law and fact. Those are the types of claims presented in this case and, therefore, this Court applies the standard of review at § 2254(d)(1) to them. *See Jermyn v. Horn*, 266 F.3d 257, 305-06 & n.24 (3d Cir. 2001). Another provision of AEDPA's standard of review, codified at § 2254(d)(2), provides that a petitioner must demonstrate that the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." This provision applies when a petitioner "challenges the factual basis for" the state court's "decision rejecting a claim[.]" *Burt v. Titlow*, 571 U.S. 12, 18 (2013). The standard of review set forth at § 2254(d)(2) is not applicable to this case because no decision rendered by the Superior Court that is at issue here was premised upon a finding of fact made by it or the PCRA court following, for example, an evidentiary hearing. Rather, the Superior Court applied the historical facts or record to Petitioner's claims. However, to the extent that § 2254(d)(2) arguably applies to this Court's review of any of Petitioner's claims, Petitioner has not overcome the burden imposed by it. That is, he has not demonstrated that the Superior Court's decision rejecting a claim was based upon an unreasonable determination of the facts.

2012) ("We similarly believe that in referencing 'adjudication on the merits,' AEDPA draws no such distinction for alternative rulings. Rather, it suggests that where a state court has considered the merits of the claim, and its consideration provides an alternative and sufficient basis for the decision, such consideration warrants [AEDPA] deference.")

If, when evaluating a claim, this Court determines that Petitioner has satisfied his burden under § 2254(d), this Court must then "proceed to review the merits of the claim *de novo* to evaluate if a constitutional violation occurred." *Vickers*, 858 F.3d at 849 (citing *Lafler v. Cooper*, 566 U.S. 156, 174 (2012)).[14] That is because "a federal court can only grant the Great Writ if it is 'firmly convinced that a federal constitutional right has been violated[.]'" *Id.* (citing *Williams*, 529 U.S. at 389, and *Horn v. Banks*, 536 U.S. 266, 272 (2001) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review…none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]")).

In applying § 2254(d)(1)'s standard of review, this Court's first task is to ascertain what law falls within the scope of the "clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1). It is "'the governing legal principle or principles set forth by the Supreme Court *at the time the state court renders its decision*.'" *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 280 (2016) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (emphasis added)). It "includes only 'the holdings, as opposed

---

[14] These steps "sometimes merge in cases in which the federal habeas court determines that the state court engaged in an 'unreasonable application' of clearly established Supreme Court precedent because it will be apparent from the explication of why the state court unreasonably applied that precedent that, under any reasonable application, a constitutional violation did occur." *Vickers*, 858 F.3d at 849 n.8.

to the dicta, of [the Supreme] Court's decisions.'"[15] *White v. Woodall*, 572 U.S. 415, 420 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012), which quoted *Williams*, 529 U.S. at 412).

Once the "clearly established Federal law, as determined by the Supreme Court of the United States" is ascertained, this Court must determine whether the Superior Court's adjudication of the claim at issue was "contrary to" that law. *Williams*, 529 U.S. at 404-05 (explaining that the "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) have independent meaning). A state-court adjudication is "contrary to…clearly established Federal law, as determined by the Supreme Court of the United States" § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams*, 529 U.S. at 405, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," *id.* at 406.

A "run-of-the-mill" state-court adjudication applying the correct legal rule from Supreme Court decisions to the facts of a particular case will not be "contrary to" Supreme Court precedent. *Williams*, 529 U.S. at 406. Therefore, the issue in most federal habeas cases is whether the adjudication by the state court survives review under § 2254(d)(1)'s "unreasonable application" clause.

---

[15] The Supreme Court "has repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" *Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam) (quoting § 2254(d)(1) and citing *Lopez v. Smith*, 574 U.S. 1 (2014) (per curiam)). *See, e.g., Renico v. Lett*, 559 U.S. 766, 779 (2010) (state court's failure to apply decision by federal circuit court "cannot independently authorize habeas relief under AEDPA."). Additionally, "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced.'" *Lopez*, 574 U.S. at 2 (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam)).

"A state court decision is an 'unreasonable application of federal law' if the state court 'identifies the correct governing legal principle,' but 'unreasonably applies that principle to the facts of the prisoner's case.'" *Dennis*, 834 F.3d at 281 (quoting *Williams*, 529 U.S. at 413). To satisfy his burden under this provision of AEDPA's standard of review, Petitioner must do more than convince this Court that the Superior Court's decision was incorrect. *Id.* He must show that it "'was *objectively* unreasonable.'" *Id.* (quoting *Williams*, 529 U.S. at 409) (emphasis added by Court of Appeals). This means that Petitioner must demonstrate that the Superior Court's decision "*was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*" *Richter*, 562 U.S. at 103 (emphasis added). As the Supreme Court noted:

> It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *See Lockyer, supra*, at 75, 123 S. Ct. 1166. If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

*Id.* at 102.

C.    Exhaustion and Procedural Default

The "exhaustion doctrine" requires that a state prisoner raise his federal constitutional claims in state court through the proper procedures before he litigates them in a federal habeas petition. *See, e.g., Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997). It is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). It "is designed to give the state courts a full and fair opportunity to resolve federal

constitutional claims before those claims are presented to the federal courts[.]" *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Additionally, and importantly, a petitioner must have "invoke[d] one complete round of the State's established appellate review process[,]" in order to satisfy the exhaustion requirement. *O'Sullivan*, 526 U.S. at 845. In Pennsylvania, this requirement means that a petitioner in a non-capital case such as this one must have first presented every federal constitutional claim raised in his federal habeas petition to the Superior Court either on direct or PCRA appeal. *See, e.g., Lambert v. Blackwell*, 387 F.3d 210, 233-34 (3d Cir. 2004).

The doctrine of procedural default, like the doctrine of exhaustion, is "grounded in concerns of comity and federalism," *Coleman*, 501 U.S. at 730. To succinctly summarize it, it provides that a Pennsylvania state prisoner in a non-capital case defaults a federal habeas claim if he: (a) failed to present it to the Superior Court and he cannot do so now because the state courts would decline to address the claims on the merits because state procedural rules (such as, for example, the PCRA's one-year statute of limitations) bar such consideration; or (b) failed to comply with a state procedural rule when he presented the claim to the state court, and for that reason the Superior Court declined to address the federal claim on the merits. *See, e.g., Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *O'Sullivan v. Boerckel*, 526 U.S. 838, 851-56 (1999) (Stevens, J. dissenting) (describing the history of the procedural default doctrine); *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Lines v. Larkins*, 208 F.3d 153, 162-69 (3d Cir. 2000).

A petitioner may avoid the default of a claim by demonstrating "cause for the default and actual prejudice as a result of the alleged violation of federal law[.]"[16] *Coleman*, 501 U.S. at 750.

---

[16] A petitioner may also overcome his default by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. This means that a *Footnote continue on next page…*

"'Cause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[.]" *Id.* at 753 (emphasis in original).

The general rule is that, because there is no federal constitutional right to counsel in a PCRA proceeding, a petitioner cannot rely upon PCRA counsel's ineffectiveness to establish the "cause" necessary to overcome the default of a federal habeas claim. *Id.*; *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017). In *Martinez v. Ryan*, 566 U.S. 1 (2012) the Supreme Court announced a narrow exception to this rule. In relevant part, it held that in states like Pennsylvania, where the law requires that claims of ineffective assistance of trial counsel be raised for the first time in a collateral proceeding,[17] a petitioner may overcome the default of a *claim of trial counsel's ineffectiveness.* To do so, the petitioner must demonstrate: (1) the defaulted claim of trial counsel's ineffectiveness is "substantial" and (2) PCRA counsel was ineffective within the meaning of *Strickland v. Washington*, 466 U.S. 668 (1984) for (3) failing to raise that claim in the "initial review collateral proceeding" (meaning to the PCRA court). *Martinez*, 566 U.S. at 17. The holding in *Martinez* is limited to defaulted claims asserting that *trial counsel was ineffective. See, e.g., Davila*, 137 S. Ct. at 2062-70. It does not apply to any other type of defaulted claim. *Id.*

The Court of Appeals has explained that a claim that trial counsel was ineffective is "substantial" if it has "some merit." *Workman v. Sup't Albion SCI*, 915 F.3d 928, 938 (3d Cir. 2019). The evaluation is the same one that a federal court undertakes when it considers whether to

---

procedural default may be excused if the petitioner presents evidence of "actual innocence" that is "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" *Schlup v. Delo*, 513 U.S. 298, 316 (1995). In only the extraordinary case will a petitioner be able to establish a "fundamental miscarriage of justice," and this is not one of the rare cases in which that rule is implicated.

[17] In Pennsylvania, a defendant typically may not litigate ineffective assistance of trial counsel claims on direct appeal. Such claims must be raised in a PCRA proceeding. *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002) (abrogated in part on other grounds by *Commonwealth v. Bradley*, 261 A.3d 381 (Pa. 2021)).

grant a certificate of appealability. *Id.*; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Thus, a petitioner "must 'show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should be resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Id.* (quoting *Martinez*, 566 U.S. at 14, which cited *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

If the Superior Court did not adjudicate a claim on the merits, this Court must determine whether that was because Petitioner procedurally defaulted it. If the claim is not defaulted, or if Petitioner has established grounds to excuse his default, the standard of review at 28 U.S.C. § 2254(d) does not apply and the Court reviews the claim *de novo*.[18] *See, e.g., Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). However, as previously explained, this Court applies a *de novo* review only if the Superior Court did not provide an alternative adjudication on the merits. *See, e.g.*, *Rolan*, 680 F.3d at 320.

D.    The *Strickland* Standard

Most of Petitioner's claims assert that trial counsel provided him with ineffective assistance. In one claim (Claim 6) he asserts that direct appeal counsel was ineffective. These claims are governed by the standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* recognized that a defendant's Sixth Amendment right to the assistance of counsel for his defense entails the right to be represented by an attorney who meets

---

[18] In all cases and regardless of whether the standard of review at § 2254(d) applies, a state court's factual determinations are presumed to be correct under § 2254(e)(1) unless Petitioner rebuts that presumption by clear and convincing evidence. *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010); *Nara v. Frank*, 488 F.3d 187, 201 (3d Cir. 2007) ("the § 2254(e)(1) presumption of correctness applies regardless of whether there has been an 'adjudication on the merits' for purposes of § 2254(d).") (citing *Appel*, 250 F.3d at 210).

at least a minimal standard of competence.[19] 466 U.S. at 685-87. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]" *Titlow*, 571 U.S. at 24.

Under *Strickland*, it is Petitioner's burden to establish that his "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. The Supreme Court has emphasized that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]'" *Titlow*, 571 U.S. at 22 (quoting *Strickland*, 466 U.S. at 690); *Richter*, 562 U.S. at 104 ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (quoting *Strickland*, 466 U.S. at 689). Counsel cannot be deemed ineffective for failing to raise a meritless claim. *See, e.g., Preston v. Sup't Graterford SCI*, 902 F.3d 365, 379 (3d Cir. 2018).

*Strickland* also requires that Petitioner demonstrate that he was prejudiced by counsel's alleged deficient performance. This places the burden on him to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

---

[19] Since the Fourteenth Amendment guarantees a criminal defendant pursuing a first appeal as of right certain "minimum safeguards necessary to make that appeal 'adequate and effective,'" *Evitts v. Lucey*, 469 U.S. 387, 392 (1985) (quoting *Griffin v. Illinois*, 351 U.S. 12, 20 (1956)), including the right to the effective assistance of counsel, *id.* at 396, the ineffective assistance of counsel standard of *Strickland* applies to a claim that direct appeal counsel was ineffective. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *United States v. Cross,* 308 F.3d 308, 315 (3d Cir. 2002).

The Supreme Court in *Strickland* noted that although it had discussed the performance component of an effectiveness claim prior to the prejudice component, there is no reason for an analysis of an ineffectiveness claim to proceed in that order. 466 U.S. at 697. If it is more efficient to dispose of an ineffectiveness claim on the ground that the petitioner failed to meet his burden of showing prejudice, a court need address only that prong of *Strickland. Id.*

Pennsylvania courts typically articulate *Strickland*'s standard in three parts, while federal courts set it out in two. The legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts. *See, e.g., Commonwealth. v. Mitchell*, 105 A.3d 1257, 1266 (Pa. 2014) ("this Court has divided [*Strickland*'s] performance component into sub-parts dealing with arguable merit and reasonable strategy. Appellant must, therefore, show that: the underlying legal claim has arguable merit; counsel had no reasonable basis for his act or omission; and Appellant suffered prejudice as a result."); *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1117-18 (Pa. 2012) ("In order to obtain relief on a claim of ineffectiveness, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland*[.]").

Here, the Superior Court applied the correct *Strickland* analysis when it evaluated Petitioner's claims of ineffective assistance. *Dixon III*, 2017 WL 5946524 at *11. Therefore, Petitioner cannot demonstrate that the Superior Court's adjudication of any of his claims was "contrary to" *Strickland. Williams*, 529 U.S. at 406.

Accordingly, with respect to those claims of ineffective assistance that the Superior Court adjudicated on the merits, in order to overcome AEDPA's standard of review Petitioner must demonstrate that the Superior Court's decision was: (1) an "unreasonable application of"

*Strickland*, 28 U.S.C. § 2254(d)(1); or (2) was "contrary to" or an "unreasonable application of" of any other applicable Supreme Court decision, *id.*[20]

Finally, the Court notes that on those occasions when the Superior Court denied a claim, at least in part, because he failed to establish *Strickland's* deficient-performance prong, Petitioner faces a particularly difficult burden. That is because "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'" *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 689). When AEDPA's standard or review applies, the burden upon a petitioner "is all the more difficult." As the Supreme Court explained:

> [t]he standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S.] at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. [*Id.*] Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (parallel citations omitted).

E.     Petitioner's Claims

**Claim One**

Petitioner asserts that trial counsel was ineffective for failing to object to the addition of the count of firearms not to be carried without a license in the Information in January 2009 since

---

[20] In the instances in which the Superior Court, in adjudicating an ineffective assistance claim, ruled on the merits of an underlying constitutional claim of error, this Court must apply § 2254(d)'s standard of review to its adjudication of that underlying constitutional claim. *See*, *e.g.*, *Mathias v. Superintendent Frackville*, 876 F.3d 462, 479-80 (3d Cir. 2017).

that count was not included in the police complaint, and/or for failing to object to the October 2010 amendment to the Information to include the charge of person not to possess a firearm. (ECF 1 at 8.)

The Superior Court denied this claim on the merits, explaining that under the law in Pennsylvania, courts may allow amendment of a criminal information so long as the amendment does not prejudice the defense. *Dixon III*, 2017 WL 5946524 at \*11-12 (citing Pa.R.Crim.P. 564; *Commonwealth v. Williams*, 166 A.3d 460, 464 (Pa. Super. 2017); *Commonwealth v. Mosley*, 585 A.2d 1057, 1059-60 (Pa. Superior Ct. 1991); *Commonwealth v. Stanley*, 401 A.2d 1166, 1175 (Pa. Super. Ct. 1979).) The Superior Court held that the amendment to the Information did not run afoul of state law, *id.*, and this Court is bound by that state-law determination.

Counsel cannot be found to be ineffective for failing to raise a meritless claim, and Petitioner cannot establish that he was prejudiced by trial counsel's failure to raise the objections Petitioner claims he should have raised. Therefore, the Superior Court's adjudication of Claim One was not an "unreasonable application of" *Strickland*. Accordingly, Claim One is denied.

### Claim Two

Petitioner alleges that "trial counsel rendered ineffective assistance in reference to the alleged statements he made" to Det. McGee on November 11, 2008 at Mercy Hospital. (ECF 1 at 10.) He asserts that those statements were made when he "was sedated [and] unable to understand any of his *Miranda* rights[.]" (*Id.*)

There are several problems with this claim. First, Petitioner did not raise this ineffective assistance claim to the Superior Court in his PCRA proceeding and Petitioner admits that it is procedurally defaulted. (ECF 15 at 1.) Second, trial counsel *did* contest the admissibility of Petitioner's statements to Det. McGee in the pre-trial motion to suppress in which he argued,

among other things, that Petitioner was impaired at the time he made the statement because he was on a morphine drip and taking Percocet at the time he gave it. (Trial Tr. at 9-28.) The trial court, after reviewing Petitioner's medical records for the date in question, denied the suppression motion. In so holding, it credited Det. McGee's suppression-hearing testimony that Petitioner was alert and did not appear to have any problems understanding what Det. McGee said to him during the November 11, 2008 interview. (*Id.* at 12-13, 17, 28.)

Petitioner does not assert what, if anything, his trial counsel should have done differently in litigating the suppression motion. He only faults trial counsel for failing to "preserve to issue" in "post-verdict" motions. (ECF 1 at 10.) However, since trial counsel pursued a pre-trial suppression motion on the matter, the issue did not have to be "preserved" for appellate review by raising it in a post-trial motion.[21]

Based upon the foregoing, Claim Two is denied because it is procedurally defaulted and also because it has no merit.

### Claim Three

Petitioner asserts in Claim Three that trial counsel was ineffective for failing to object to the testimony of the Commonwealth's expert, Walter Lorenz, who stated that the DNA evidence recovered from the grip of the .22 caliber pistol was consistent with Petitioner's DNA profile and inconsistent with that of the victim or Edward. (ECF 1 at 11.) The Superior Court denied this claim on the merits because Petitioner failed to explain what objection trial counsel should have raised to Lorenz's testimony. *Dixon III*, 2017 WL 5946524 at *13. It also pointed out that, as the PCRA

---

[21] As explained above, on direct appeal Petitioner alleged that the *trial court erred* in denying the suppression motion. (*See Dixon II*, Resp's Ex. 17 at 169; Resp's Ex. 14 at 96-97.) Petitioner does not raise that claim in this federal habeas proceeding, as a claim of ineffective assistance of counsel is distinct and different than a stand-alone claim of trial court error. *See, e.g.*, *Gattis v. Snyder*, 278 F.3d 222, 238 n.6 (3d Cir. 2002).

court explained, "[t]he testimony with respect to this firearm showed an adequate chain of custody was maintained with respect to the collection and testing of the sample[.]" *Id.*

Similarly, Petitioner does not explain in his habeas petition what meritorious objection to Lorenz's testimony was available to the defense that trial counsel did not make. Petitioner simply has not satisfied his burden of demonstrating that the Superior Court's decision was an "unreasonable application of" *Strickland*. Therefore, Claim Three is denied.

**Claim Four**

Petitioner asserts that trial counsel was ineffective for failing to investigate the origins of the white T-shirts investigators found in Edward's SUV in order to counter the Commonwealth's evidence that those T-shirts likely were stolen from the victim's clothing store. (ECF 1 at 13.) Petitioner provides no alternative explanation regarding where the T-shirts might have come from. Nor does he explain what information trial counsel would have learned had he investigated the origins of the T-shirts.

The Superior Court denied this claim on the merits, concluding that Petitioner failed to demonstrate the requisite prejudice to prevail under *Strickland*. *Dixon III*, 2017 WL 5946524 at *13 n.10. Specifically, it held that "[t]he evidence of guilt was so overwhelming that any determination that the sports t-shirts at issue were not from [the victim's] store would have been insignificant by comparison[,]" and, therefore, Petitioner "failed to establish a reasonable probability" that the outcome of his trial would have been different. (*Id.*)

There is no basis for this Court to question the Superior Court's adjudication of this claim. The white T-shirts recovered from Edward's SUV were just one of the many types of evidence the Commonwealth introduced at Petitioner's trial to prove that Petitioner and Edward were the perpetrators of the crimes at CC&M on November 8, 2008. The Superior Court appropriately

looked to the strength of the evidence of Petitioner's guilt to determine that he was not prejudiced by trial counsel's alleged failure to investigate the origins of those T-shirts and its decision to deny Claim Four was not an "unreasonable application of" *Strickland*. *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999) ("It is firmly established that a court must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied."). Therefore, Claim Four is denied.

### Claim Five

Petitioner filed a civil complaint against trial counsel in September 2009 in which he asserted causes of action in negligence and negligent infliction of emotional distress for failing to take calls from Petitioner and based on the brevity and infrequency of visits between them. (Resp's Ex. 6 at 37-43.) The docket sheet for Petitioner's civil action does not reflect that the complaint was served on trial counsel. (Resp's Ex. 5 at 36.) In any event, the Common Pleas Court judge to whom the case was assigned dismissed the complaint on October 13, 2009 (less than a month after it was filed and more than one year before Petitioner's trial) for failure to state a claim that would have any basis for relief in law or in fact. (Resp's Ex. 7 at 44-45.) No appeal was taken from this order. (*Id.*)

In Claim Five, Petitioner contends that trial counsel was ineffective because Petitioner's prior civil action against him created a conflict of interest and, as a result, trial counsel "failed to undertake the best possible means of representation, resulting in Petitioner being wrongfully convicted." (ECF 1 at 17.) In rejecting this claim, the Superior Court held that Petitioner failed to demonstrate that trial counsel was operating under a conflict of interest at the trial. *Dixon III*, 2017 WL 5946524 at *14. It further held that Petitioner "failed to explain how the alleged conflict of interest affected trial counsel's representation of him." *Id.*

Petitioner has not demonstrated that the Superior Court's adjudication of Claim Five was an "unreasonable application of" *Strickland* or any other Supreme Court precedent. Therefore, Claim Five is denied.

## Claim Six

Petitioner asserts that Attorney Coffey was ineffective for failing to raise on direct appeal claims of trial counsel's ineffectiveness. As previously noted, however, under Pennsylvania law ineffective assistance of counsel claims are to be raised in a PCRA proceeding, not on direct appeal. *Grant*, 813 A.2d at 738; *see also Commonwealth v. Holmes*, 79 A.3d 562, 563-64 (Pa. 2013) (setting forth the narrow exceptions to this general rule, none of which apply here). Thus, as the Superior Court held, it was not appropriate for Attorney Coffey to raise ineffective assistance of trial counsel claims in the direct appeal. *Dixon III*, 2017 WL 5946524 at *14.

The Superior Court's adjudication of Claim Six was a reasonable application of *Strickland* and the claim has no merit. Therefore, it is denied.

## Claim Seven

Petitioner asserts that trial counsel was ineffective for failing to object when the prosecutor allegedly impermissible struck jurors because of their race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). In *Batson*, the Supreme Court held that a prosecutor's purposeful racial discrimination in the selection of the jury violated the state prisoner's equal protection rights under the Fourteenth Amendment.

When determining whether there has been purposeful discrimination in the striking of a prospective juror, the trial court is to engages in a three-step process. First, a defendant must make a *prima facie* showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror

in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. *Batson*, 476 U.S. at 96-98; *see also Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008).

In denying Claim Seven, the Superior Court first held that there was no evidence in the certified record of the racial profile of the venirepersons against whom the prosecution used its preemptory strikes. *Dixon III*, 2017 WL 5946524 at *15. This was both reasonable and correct, as there is nothing factually in the record that supports Petitioner's claim.

However, the record does contain clues as to what occurred during *voir dire*. Specifically, Attorney Patterson, in his no-merit letter, represented that he reviewed trial counsel's case file and his jury selections notes. (Resp's Ex. 32 at 325.) His review of those notes indicated that the prosecution used four peremptory challenges: the first was used to strike a black male; the second a white female, the third a white male, and the fourth an unidentified male. (*Id.*) The PCRA court gave an identical account of jury selection. (Resp's Ex. 38 at 389.)[22]

The Superior Court considered this information and explained that "even if it accepted the PCRA court's representation of the missing evidence, [Petitioner] still could not establish an improper pattern of purposeful exclusion of members of [his] race, given that at least half of those removed were of a different race." *Dixon III*, 2017 WL 5946524 at *15.

Notably, Petitioner does not give an alternative account of what happened at jury selection. The Superior Court recognized this when it observed that Petitioner "does not contradict the PCRA court's description of the stricken venirepersons." *Id.* Similarly, in this federal habeas case Petitioner asserts only that trial counsel should have raised a *Batson* violation, but he does not

---

[22] It is not clear from the PCRA court's opinion whether it was relying upon Attorney Patterson's summary or if it independently reviewed its own juror sheet.

provide any facts to support this claim. (ECF 1 at 20.) As with many of his claims, he simply contends that his rights were violated without providing any factual support.

Based upon the foregoing, Petitioner has not met his burden of establishing that the Superior Court's adjudication of Claim Seven was an "unreasonable application of" *Strickland*, or that it was "contrary to" or an "unreasonable application of" *Batson*. Accordingly, the Superior Court's adjudication withstands review under § 2254(d)(1) and Claim Seven is denied.

### Claim Eight

Under the Pennsylvania Rules of Criminal Procedure, a criminal defendant must be brought to trial within either 365 or 180 days, depending on his or her pre-trial incarceration status. Pa.R.Crim.P. 600. Generally, incarcerated defendants must be brought to trial within 180 days. Pa.R.Crim.P. 600(b). In Petitioner's case, the Commonwealth was required to bring him to trial within 365 days, even though he was incarcerated prior to trial. That was because the 180-day rule applies only where incarcerated defendants are entitled to release on bail; if they are not entitled to bail, the ordinary 365 day rule applies. *Id.* Petitioner was not eligible for bail because he had been accused of a crime punishable by life in prison. Pa. Const. art. I,§ 14; 18 Pa.C.S. § 1102 (murder carries a maximum penalty of life in prison (or death)).

In Claim Eight, Petitioner contends that "trial counsel was ineffective for failing to file a motion to dismiss the charges against [him] based on violations of [his] Rule 600 speedy trial rights." (ECF 1 at 22.) The Superior Court denied this claim on the merits because Rule 600 has a number of tolling provisions. Pa.R.Crim.P. 600(c). It addressed all of the time that was excludable or excusable in Petitioner's case and held that there was no violation of Petitioner's speedy trial rights under Rule 600 because Petitioner's trial was held within the allowable 365 days. *Dixon III*, 2017 WL 5946524 at *15.

Because this Court is bound by the Superior Court's Rule 600 calculation since that is a state court interpretation of state law, Petitioner cannot demonstrate that trial counsel performed deficiently for not filing a motion to dismiss premised upon an alleged violation of his speedy-trial rights or that he was prejudiced. Accordingly, the Superior Court's adjudication of Claim Eight survives review under §2254(d)(1) and is denied.

## Claim Nine

In Claim Nine, Petitioner asserts that trial counsel was ineffective for failing to object to the jury instruction on reasonable doubt because the trial judge improperly equated reasonable doubt to his own personal experiences. (ECF 1 at 23-24.)

By way of background, during the closing jury charge the trial court gave the following instruction on reasonable doubt:

> [The] presumption of innocence can be overcome if and only if you are individually and collectively convinced that the Commonwealth has met its burden by proving the elements of the offenses charged beyond a reasonable doubt.
>
> A reasonable doubt has been defined as that which would cause you to pause or hesitate before doing something important in your own personal affairs. It must fairly arise from the evidence that's been presented or lack thereof.
>
> The Commonwealth's burden is to prove its case beyond a reasonable doubt. It is not required to prove its case to a mathematical certainty or even to demonstrate the impossibility of innocence. It is only beyond a reasonable doubt.
>
> If you look at that term grammatically, it may help you understand it a little bit better.
>
> It is a noun modified by an adjective. You may have a doubt. The ultimate question, however, is whether or not that doubt is reasonable.
>
> An example that I often use occurred a couple of summers ago when one of my sons came over to our house and asked me if I would follow him down to the car dealer because he wanted to drop his car off for inspection and he didn't want to stay there. I did. I brought him back to the house. We did a few things, and then he told me, as he does all too often, that he's hungry. So I made him lunch.
>
> We got a call after the lunch. His car was ready and we could go back to pick it up. We got back in my car.
>
> While driving to the car dealership, he said: Did you turn off the stove? I had a doubt. I had a question. The ultimate question was whether or not I did. I worked through the process.

When I thought about what had happened, then I said: Yes, I did. He said: Are you sure? Well, he wasn't anywhere near the stove, but I was. I said: Yes, I did.

We drove to pick up his car. We came back to our house, and the first thing he did was go over to the stove. I didn't have to do that, because I knew what I had done. Initially I had a doubt. But ultimately I worked through the process, went back through the facts, and then made the determination that doubt was not reasonable.

If you believe that the Commonwealth has met its burden of proving its case beyond a reasonable doubt, you would find the defendant guilty.

If you believe that the Commonwealth has not met that burden, you must find the defendant not guilty.

(Trial Tr. at 63-65.)

In his PCRA appeal, Petitioner argued that trial counsel was ineffective for failing to object to the reasonable doubt instruction, but he did not explain what objection trial counsel should have raised. *Dixon III*, 2017 WL 5946524 at *16. Therefore, the Superior Court explained that it would look at the cases Petitioner cited in his appellate brief (*Victor v. Nebraska*, 511 U.S. 1 (1994) and *Cage v. Louisiana*, 498 U.S 39 (1990) (per curiam)) to determine if the language in the instruction ran afoul of those decisions. *Id.* at *16-17. It concluded that none of the challenged language in those opinions was given at Petitioner's trial. *Id.* at *17. The Superior Court further held that any more specific claim was waived for failure to adequately plead it. *Id.* at *17 n.16. At the end of its analysis, it cautioned the trial court judge "that a charge equating reasonable doubt to a judge's personal experiences may raise questions we do not reach here." *Id.*

No doubt prompted by that the Superior Court's observation, Petitioner argues before this Court for the first time in Claim Nine that trial counsel was ineffective because he should have objected to the illustration the trial court used to explain the concept of reasonable doubt. (ECF 1 at 23-24.) Specifically, Petitioner contends that the trial court's instruction violated due process because it suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard.

Respondents contend that Claim Nine is procedurally defaulted because Petitioner did not raise it in state court. Petitioner admits that he procedurally defaulted this claim but asserts that he can overcome the default under *Martinez* because his PCRA counsel should have raised it. Therefore, Petitioner argues, this Court must review Claim Nine *de novo*. (ECF 15.)

Petitioner's *Martinez* argument is not particularly persuasive. The Superior Court reviewed the claims he listed in his *pro se* appellate brief on the merits if he developed that claim and adequately explained the basis for it. That included the general claim he raised regarding the reasonable doubt instruction. Therefore, any failure to exhaust the particular claim of ineffective assistance Petitioner raises for the first time in Claim Nine is attributable solely to him, not PCRA counsel.

However, Respondents argue in the alternative that Claim Nine has no merit. Because the Court may simply review Claim Nine *de novo* and deny it on that basis, the Court will do so here. *Lambrex v. Singletary*, 520 U.S. 518, 525 (1997) (the court may avoid the more complex issue of procedural default and evaluate the claim on the merits if it is more efficient to do so).

Regarding the merits of this claim, even though it is based on ineffective assistance, a review of the constitutional law on jury instructions is necessary. When language in jury instructions is challenged, the language in question "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The court must then consider "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)); *see also Victor v. Nebraska*, 511 U.S. 1, 6 (1994); *Smith v. Horn*, 120 F.3d 400, 411 (3d Cir. 1997).

There is no particular set of words required to advise the jury of the definition of reasonable doubt. *Victor*, 511 U.S. at 5. Instead, the instruction, taken as a whole, must correctly convey the concept to the jury. *Id.* The Court of Appeals has explained:

> The Constitution requires that the government prove every element of [a] criminal charge beyond a reasonable doubt to obtain a conviction. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368 (1970). While a trial court must advise the jury of the government's burden of proof, no particular set of words is mandated. *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S. Ct. 1239, 1243, 127 L. Ed. 2d 583 (1994). Due process is satisfied if the instructions, taken as a whole, accurately convey the concept of reasonable doubt to the jury. *Id.* (citing *Holland v. United States*, 348 U.S. 121, 140, 75 S. Ct. 127, 137, 99 L. Ed. 150 (1954)). Thus, although we have considered each of [defendant's] criticisms, ultimately we must determine whether the entire instruction the jury received led it to apply the correct standard of proof, if not, [defendant's] conviction will be reversed. *Sullivan v. Louisiana*, 508 U.S. 275, 279-80, 113 S. Ct. 2078, 2081-82, 124 L. Ed. 2d 182 (1993).

*United States v. Thayer*, 201 F.3d 214, 221 (3d Cir. 1999), *abrogation on other grounds recognized by Fahie v. Virgin Islands*, 858 F.3d 162 (3d Cir. 2017)). The reviewing court's task is to determine "not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it." *Victor*, 511 U.S. at 6 (emphasis in original).

In this case, when the trial court charged on reasonable doubt, it used an example of leaving home and then having doubts as to whether a burner on the stove was left on. (Trial Tr. II at 64-65.) This illustration came after the trial court expressly and unambiguously told the jury that petitioner was presumed to be innocent, and that the presumption of innocence could only be overcome if the jurors individually and collectively were convinced that the Commonwealth had met its burden of proving the elements of the charged offenses beyond a reasonable doubt. *Id.* at 63. The trial court then gave the standard definition of reasonable doubt as a doubt that would lead a person to pause or hesitate before doing something important in his or her own personal affairs. *Id.*

Considered in the context of the instruction as a whole, Petitioner has not shown that there is a reasonable likelihood that the jury applied the challenged instruction in a way that violated his due process rights. Since counsel cannot be found to be ineffective for failing to raise a meritless objection, Petitioner has not established *Strickland*'s first prong (that trial counsel's "representation fell below an objective standard of reasonableness" for failing to object to the instruction). 466 U.S. at 688. For this reason alone, Claim Nine fails.

Alternatively, Petitioner has not demonstrated that he was prejudiced by trial counsel's alleged failure to object to the instruction. Petitioner argues that because he is asserting that trial counsel was ineffective for failing to object to the reasonable doubt instruction, he does not have to demonstrate *Strickland's* prejudice prong. (ECF 15 at 13-14 (citing *Weaver v. Massachusetts*, — U.S. —, 137 S. Ct. 1899 (2017)). The Court of Appeals recently rejected the same argument in *Baxter v. Sup's Coal Township*, 998 F.3d 542 (3d Cir. 2021), *petition for cert. filed* (U.S. Sept. 30, 2021) (No. 20-1259). It held that where, as is the case here, a reasonable doubt instruction is given, a petitioner who is claiming that instruction contains an error within the context of an ineffective assistance of trial counsel claim must prove he was prejudiced under the *Strickland* standard. *Id.* at 548-49.[23]

---

[23] In *Baxter*, the Court of Appeals explained that "[c]ontrary to [the petitioner's] argument, *Weaver* did not establish that an erroneous reasonable doubt instruction is a structural error that warrants presumptive prejudice. In *Weaver*, [which address trial counsel's failure to object to the closure of the courtroom during jury selection,] the Supreme Court acknowledged that its holding did not call into question precedents determining that certain structural errors, such as an erroneous jury instruction, require automatic reversal if raised on direct appeal. Furthermore, the Court declined to address, in the context of structural errors other than the one at issue in *Weaver*, 'whether the result should be any different if the errors were raised instead in an ineffective-assistance claim on collateral review,' as is the here." 998 F.3d at 548 n.6 (quoting *Weaver*, 137 S. Ct. at 1912 (additional citations omitted).

Under the circumstances of this case, where the language surrounding the trial court's "personal experience" example correctly expressed the reasonable doubt standard, and in light of the strength of the evidence the Commonwealth introduced at Petitioner's trial establishing his guilt, Petitioner has not demonstrated that he was prejudiced when trial counsel did not object to the instruction. *Id.* at 549 (looking to the entire instruction and the evidence against the petitioner and concluding that, "[i]n light of this evidence, [the petitioner] cannot show he was prejudiced by the phrasing of the example in an otherwise correct reasonable doubt jury instruction.")

Based upon the foregoing, Claim Nine fails under a *de novo* review. Therefore, it is denied.

## Claim Ten

Second-degree murder is defined under Pennsylvania law as a homicide that "is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony[,]" including robbery. 18 Pa.C.S. § 2502(b). The trial court, in its charge, told the jurors that a second degree murder is a killing that occurs "during the commission of certain felonies." (Trial Tr. II at 72-73.) The Court then instructed: "In order for you to find the defendant guilty of the crime of second degree murder, you must be satisfied that [the victim] was killed; second, that the defendant did so while in the course of committing or attempting to commit a robbery; and third, that he was acting with malice." *Id.* at 73.

In Claim Ten, Petitioner contends that trial counsel was ineffective for failing to object to the instruction given to the jury on second-degree murder because "he was not the actual slayer nor was he involved in the underlying felony." (ECF 1 at 25.) His assertions clearly have no basis in light of the evidence introduced at his trial. Moreover, in denying this claim, the Superior Court cited its own precedent that upheld the exact language the trial court used. *Dixon III*, 2017 WL 5946524 at *18-19. It held that the trial court's instruction was proper under state law under the

circumstances of Petitioner's case, where the Commonwealth's theory was that Petitioner shot the victim while engaging in the robbery. *Id.*

This Court is bound by the Superior Court's determination that the instruction was appropriate under Pennsylvania law. *See*, *e.g.*, *Priester*, 382 F.3d at 402; *see also Real v. Shannon*, 600 F.3d 302, 309-10 (3d Cir. 2010) ("A federal court may re-examine a state court's interpretation of its own law only where this interpretation appears to be an obvious subterfuge to evade consideration of a federal issue. Because there is nothing in the record to suggest that the Superior Court was attempting to evade consideration of a federal issue, we must accept that Court's conclusion that the trial court's instruction was consistent with Pennsylvania law.") (internal quotations and citations omitted).

In conclusion, there is no basis for this Court to conclude that the Superior Court's denial of Claim Ten was an "unreasonable application of" *Strickland*. Therefore, Claim Ten is denied.

## Claim Eleven

Petitioner argues that trial counsel conducted no investigation and had no strategy at trial. He asserts that trial counsel should have stuck to "the truth" and told the jury that he was merely present at the scene of the crime and that there was no "conspiratorial design" between him and the shooter. (ECF 1 at 27.)

In denying this claim, the Superior Court first quoted the PCRA court's opinion, in which it had explained:

> This claim…is refuted by the record. [Trial counsel] knew that the evidence that was going to be presented by the Commonwealth would place [Petitioner] and ... [Edward] at the scene of the homicide. It was also clear that [Petitioner] was shot at [the victim's] store and was driven by [Edward] to the hospital where he was treated. It was also evident that he had given multiple, conflicting statements about his whereabouts and involvement to the police and that [Edward] had also given multiple and conflicting statements about what they were doing at the time the homicide occurred. There was the fact that the DNA evidence was on the murder

weapon and that DNA evidence established that it was [Petitioner's] DNA on that murder weapon. The record in this case clearly shows that [trial counsel] was prepared and attempted to defend [Petitioner] in the best possible manner in spite of the overwhelming evidence against him.

*Dixon III*, 2017 WL 5946524 at *19.

The Superior Court also cited state law that explains that it is insufficient for a PCRA petitioner to state an alternative course that counsel could have chosen and then baldly state an entitlement to relief. It explained that the Supreme Court of Pennsylvania:

has previously held PCRA hearings are not discovery expeditions, but are conducted when necessary to offer the petitioner an opportunity to prove his explicit assertion of ineffectiveness raising a colorable claim about which there remains an issue of material fact. *Commonwealth v. Sneed*, 616 Pa. 1, 45 A.3d 1096, 1107 (2012). *Particularly when PCRA claims require examination of trial strategy, it is not enough to take a cold record, state alternative choices counsel could have made, and then declare an entitlement to relief. Id.* Mere conclusory allegations, without some proffer as to what counsel would say in response to the allegations are insufficient to establish entitlement to relief. *Id.* Thus a supporting document from counsel stating his reasons for the course chosen is generally necessary to establish potential entitlement to a hearing. *Id. See*, *e.g.*, Pa.R.Crim.P. 902(A)(12)(b) (PCRA petition shall contain facts supporting each ground for relief; if supporting facts do not appear of record "affidavits, documents and other evidence showing such facts" to be identified).

*Id.* (quoting *Commonwealth v. Cousar*, 154 A.3d 287, 299-300 (Pa. 2017) (emphasis added by Superior Court).

The Superior Court further held that Petitioner "makes the bald assertion" that he was prejudiced by trial counsel's alleged deficient performance "but he does not articulate what prejudice he suffered as a result of trial counsel's actions or lack thereof, and '*Strickland* prejudice is not proved by such conclusory characterization[.]'" *Id.* (quoting *Cousar*, 154 A.3d at 309).

The Superior Court's analysis of Claim Eleven comports with *Strickland*, where the Supreme Court observed:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense

after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

466 U.S. at 689 (internal citations and quotations omitted). The Supreme Court also has instructed that "[i]t should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Titlow*, 571 U.S. at 23 (quoting *Strickland*, 466 U.S. at 689).

Accordingly, the Superior Court reasonably applied *Strickland* to Claim Eleven and, therefore, its adjudication of that claim survives review under § 2254(d)(1). Therefore, Claim Eleven is denied.

## Claim Twelve

Petitioner contends in Claim Twelve that the prosecution violated the rule of *Brady v. Maryland*, 373 U.S. 83 (1963) because it allegedly suppressed evidence that, during surgery he underwent while lodged in the Allegheny County Jail, a .22 caliber bullet was removed from his back and turned over to the Allegheny District Attorney's Office. (ECF 1 at 29.) His assertion is that this alleged bullet would have proved that he was not the shooter because the victim was also shot with a .22 caliber weapon. (*Id.*)

To demonstrate a *Brady* violation, Petitioner must show that: (1) the evidence at issue was favorable to the defense, either because it was exculpatory or because it was impeaching; (2) the Commonwealth suppressed the evidence; and (3) the evidence was material. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The nondisclosed evidence is material "if there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Dennis*, 834 F.3d at 309 (internal quotations and citations omitted).

In addressing this claim, the Superior Court observed that the PCRA Court described it as "nonsensical." *Dixon III*, 2017 WL 5946524 at *20. The Superior Court then held that Petitioner met none of the elements of a *Brady* claim and was therefore not entitled to relief. (*Id.*)

There is no basis for this Court to conclude that the Superior Court's decision was "contrary to" or an "unreasonable application of" *Brady*. Moreover, Petitioner has not demonstrated that he is entitled to relief under even *de novo* review because the brief factual assertions he makes to support Claim Twelve—that a .22 caliber bullet was surgically removed from his back at some point in time when he was in the Allegheny County Jail and then turned over to District Attorney's Office—falls far short of the type of assertions that would support, or warrant further exploration of, a *Brady* claim.[24] (ECF 1 at 29.) For example, Plaintiff does not provide the Court with information regarding the date of his surgery, his medical records regarding that surgery, or an affidavit from his trial counsel indicating that information regarding that surgery, including what may have been recovered during it, was not disclosed to the defense.

The Court further notes that at Petitioner's trial the prosecution's ballistics expert, Dr. Levine, testified that he examined three CT scans of Petitioner's spinal area "to see if he could determine what kind of object was in [Petitioner] and if [he] could determine the caliber of that object." (Trial Tr. at 282.) He concluded that the bullet, which apparently was still lodged inside Petitioner at the time of trial, likely was a .38 caliber and that a .22 caliber bullet was "much too

---

[24] A review of the brief Petitioner filed with the Superior Court provides no further relevant information. In it, Petitioner repeated the same allegations he makes to this Court in his Petition and then asserted that he "was shot in the back with a .22 caliber bullet" without citing any evidence to support that assertion. (Resp's Ex. 39 at 423-24.)

small" to be the caliber bullet lodged in Petitioner. (Trial Tr. at 282-285). Petitioner has not directed this Court to any evidence that Dr. Levine's testimony was untruthful, that the prosecution knew his testimony was wrong, or that any information relevant to Dr. Levine's testimony was not disclosed to the defense.

Based upon the foregoing, Claim Twelve is denied.

### Remaining Claims

Petitioner raises numerous claims which the Superior Court did not adjudicate on the merits and held were waived because Petitioner failed to develop them in his appellate brief. *Dixon III*, 2017 WL 5946524 at *21. These claims involve seven claims of ineffective assistance of trial counsel and one claim of trial court error.

Petitioner contends that trial counsel was ineffective for failing to: object to the fact that the District Attorney of Allegheny County did not sign his criminal complaint (Claim 13); "preserve the issue that a thorough inventory of the truck was not conducted by crime scene detectives" (Claim 14); challenge the introduction of the .22 caliber handgun (Claim 15); object to the prosecutor's argument that he "stashed the gun in the back of" Edward's SUV (Claim 16); conduct a pre-trial investigation of the SUV for fingerprints and other physical evidence (Claim 17); object to the trial court's alleged vouching for Dr. Levine (Claim 19); and retain an DNA expert for the defense (Claim 23). (ECF 1 at 30-44.)

The claim of trial court error is Claim 18, in which Petitioner asserts "the trial court erred when it did not include Petitioner's first sentencing hearing where trial counsel was forced to withdraw from his representation of Petitioner."[25] (ECF 1 at 41.)

---

[25] Claim 18 is exceptionally unclear, and the Court cannot discern what Petitioner means by the trial court's failure to "include" a sentencing hearing. Respondents explain the record is not even *Footnote continue on next page…*

Respondents argue that all of these claims are procedurally defaulted in light of the Superior Court's determination that Petitioner did not "explain, develop or support[ ] [them] by the record factually or legally." *Dixon III*, 2017 WL 5946524 at *21. Petitioner admits that all of the claims at issue here are procedurally defaulted. He makes the broad assertion that the Court should excuse the default of any claim the Superior Court deemed to be waived under *Martinez* because his PCRA counsel was ineffective for failure to raise the claim. (ECF 1 at 46; ECF 15 at 1.) However, Petitioner must do more than simply cite *Martinez* and include boilerplate assertions that his PCRA counsel was ineffective in order to overcome the default of a claim of ineffective assistance of trial counsel. Rather, as discussed above, he must explain why PCRA counsel rendered ineffective assistance for failing to raise the specific claim at issue, and he must also demonstrate that the defaulted claim is "substantial." *Martinez*, 566 U.S. at 17; *Workman*, 915 F.3d at 938. Petitioner has not established these two requisite factors with respect to any of his defaulted claims of trial counsel's ineffectiveness. The Court further notes that *Martinez* does not apply to Claim 18, since that is a claim of trial court error and the holding in *Martinez* is limited to defaulted claims asserting that trial counsel was ineffective. *See, e.g., Davila*, 137 S. Ct. at 2062-70.

Petitioner's final two claims (Claims 20 and 21) are not cognizable in a federal habeas proceeding. In Claim 20, Petitioner argues that his due process rights were violated because the trial court did not provide him with a copy of the trial transcript during the PCRA proceeding. (ECF 1 at 44.) Respondents counter that there can be no dispute that PCRA counsel received and reviewed the transcripts and that it was Petitioner's responsibility to obtain a copy from one of

---

clear that a first sentencing hearing occurred (the trial court's docket sheet does not reflect that more than one sentencing hearing occurred).

them. In any event, Respondents are correct that alleged errors made during the PCRA proceeding are not cognizable in a federal habeas action. As the Court of Appeals has explained:

> The federal courts are authorized to provide collateral relief where a petitioner is in state custody or under a federal sentence imposed in violation of the Constitution or the laws or treaties of the United States. 28 U.S.C. §§ 2254, 2255. Thus, the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation.

*Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998) (internal citations omitted) (emphasis added). *See also Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2004) ("[A]lleged errors in collateral proceedings are not a proper basis for habeas relief from the original conviction.").

As for Claim 21, Petitioner contends, without providing any specific factual support, that his PCRA counsel were ineffective. (ECF 1 at 46.) This claim is not cognizable because Petitioner did not have a federal constitutional right to counsel during his PCRA proceeding. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Therefore, he cannot receive habeas relief on a stand-alone claim that his PCRA counsel was ineffective,[26] a fact codified by statute at 28 U.S.C. § 2254(i), which expressly provides that "[t]he ineffectiveness of counsel during Federal or State collateral post-conviction proceedings shall not be ground for relief in a proceeding arising under section 2254." *See also Coleman*, 501 U.S. at 752-53 ("There is no constitutional right to an attorney in state post-conviction proceedings...Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.")

In conclusion, Claims 13 through 19 and Claim 23 are denied because they are procedurally defaulted. Claims 20 and 21 are denied because they are not cognizable grounds for federal habeas relief.

---

[26] PCRA counsel's alleged ineffectiveness is relevant only to the extent that it is one of the factors that must be established in order to avoid a default under *Martinez*.

## III.     Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from…the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]" 28 U.S.C. § 2253(c)(1)(A). It also provides that "[a] certificate of appealability may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* Applying those standards here, jurists of reason would not find it debatable whether each of Petitioner's claims should be denied for the reasons given herein. Accordingly, the Court will not issue a certificate of appealability on any of Petitioner's claims.

## IV.  Conclusion

Based upon the foregoing, the Court will deny each of Petitioner's habeas claims and will deny a certificate of appealability with respect to each claim.

An appropriate Order follows.


Date:  December 13, 2021

/s/ Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge